## NOAH ARMSTRONG v. THE STATE.

*No. 338.    Decided June 6.*

**1. Accomplice—Principals—Evidence.**—Where one is simply charged as an accomplice to a crime committed by others, such others are principals, and it devolves upon the State, on the trial of the accomplice, to establish the guilt of such principals, which may be done by proof of such facts as would be competent evidence against the principals were they on trial.

**2. Evidence Taken at Examining Trial.**—Where a witness, being shown his testimony taken previously on the examining trial of the case, states that the testimony is "true," *Held*, that such written testimony can be used, and is admissible as to the guilt of the accused as well as for the purpose of impeaching the witness.

**3. Principals and Accomplices—Acts and Declarations of Principals—Charge.**—On the trial of an accomplice, while the acts and declarations of a principal are always admissible against him, but not against the accomplice, yet when such acts and declarations tend to criminate the accomplice, the court should instruct the jury that the evidence could only be considered in reference to the guilt of the principal, and should not be considered as evidence of the guilt of the accomplice.    But where they do not tend to prove the guilt of the accomplice such a charge is not required.

**4. Accomplice and Accomplice Testimony—Charge.**—Where it is plain from the evidence, on the trial of a criminal case, that a party testifying is an accomplice in law or in fact, the court should so instruct the jury.    If the evidence presents a ques-

tion as to whether or not a witness is an accomplice, then and in that event the court should leave the issue to be found by the jury under appropriate instructions applying, like all other instructions, the law to the facts bearing upon the issue. Abstract propositions and definitions are insufficient where it is probable from the facts that the jury may not be able to readily apply them.

APPEAL from the District Court of Coleman. Tried below before Hon. J. O. WOODARD.

This appeal is from a conviction as an accomplice to robbery, the punishment being assessed at five years' imprisonment in the penitentiary.

The indictment charged that Will Teague and Minden Alexander were the principals, and that appellant, Noah Armstrong, prior to the commission of the crime, advised and encouraged them to commit the same, and prepared arms and aid in the way of pistols, guns, and horses, to be used by Teague and Alexander in the commission of the offense; he, the said Armstrong, not being present when the offense was committed by the other parties.

The prosecution grew out of the robbery of the Wells-Fargo company express messenger on a passenger train on the Gulf, Colorado & Santa Fe Railroad, within some 500 yards of the depot, at Coleman City, Coleman County, about half-past 11 o'clock on the night of the 24th of May, 1893. The express messenger was one John G. Barry, and the money taken from his possession by the robbers consisted of one package containing $3000 in United States currency money, expressed from the Austin National Bank, at Austin, to the Concho National Bank, at San Angelo, Texas. Also two other packages of money, paper currency, containing $500 each, addressed to two banks at Ballinger, in Runnels County. The train of cars had just gone down on the Y, some 500 yards west of the depot, and had stopped at about one of the switches, when two gun shots were fired, one on each side of the train; and almost immediately thereafter one of the masked robbers appeared at the engine with a pistol in each hand, who made the engineer and other employes get off the engine and go with him to the express car, and at his demand upon the express messenger to open the door, which he did, they were ordered to climb into the express car, the robber following them, after which he held them up in the express car while he made the express messenger open the safe and give him the packages of money above mentioned. In the meantime the other robber, who was armed with a Winchester rifle, and also masked, had come around to the same side of the car, and stood there until the robbery was accomplished. After the money had been received by the robber in the express car, he made the parties in there get out on the ground, and he and his companions backed off some distance and disappeared.

The night was a bright moonlight night, and there was a lamp burning in the express car at the time of the robbery. The robber in the express car wore a peculiarly shaped and colored hat, and the parties in the car were able to, and each did, describe his personal appearance, size, action, and manner of speech. One of the passengers sitting in the car immediately behind the express car, when he heard the guns fire, looked out of the window and saw the second robber when he came around, armed with a Winchester. He described him as a boy between 16 and 19 years of age, both from his personal appearance and the tone of his voice, heard while he was cursing some of the parties. A day or so after the robbery, the express messenger saw Will Teague in a barber shop in the town of Coleman, and from his size, the tone of his voice, and the hat which he wore, recognized him as the man who had robbed him, and Teague was arrested. Teague lived with the defendant, Noah Armstrong, on Armstrong's farm, some ten miles from the city. Some few days before the robbery Minden Alexander, commonly known as "the kid," a boy about 19 years of age, and a man named Randall Waites, came to defendant Armstrong's house, and were known to be there up to the night of the robbery. The next day they left with some horses claimed by Waites, and started off by the way of Dallas for their home, Mount Vernon, in Franklin County. There was picked up the next day after the robbery, on the north side of the Y, an empty 32-calibre Winchester rifle shell; and on the same day, at a mesquite bush some 50 or 100 yards from the Y, signs were discovered as though two horses had been hitched there. The tracks of one of these horses made a peculiar impression on the ground, and this track was carefully measured, and the tracks followed to the horse lot of the defendant Armstrong. "The kid" (Alexander) and the man Randall Waites were also arrested at Mount Vernon in Franklin County. Alexander was placed in the jail at Greenville, and the passenger who saw the boy robber at the train was taken over to Greenville, where he recognized and identified him as the boy he had seen that night with the Winchester rifle, by his size, appearance, and the tone of his voice. After Teague's arrest, as above mentioned, the officers found at defendant Armstrong's house a Winchester rifle, which was loaded with cartridges of the same size and make as the empty hull picked up at the railroad Y the day after the robbery. It was also proved that the hat which Teague wore on the night of the robbery was the hat of, and belonged to, the defendant Armstrong. After "the kid" (Alexander) was arrested and placed in jail in Greenville, he gave an order to the officers for $560, which had been left by him with Joe Waites at Mount Vernon, which money the officers got.

At the trial of this defendant, both "the kid" (Minden Alexander) and Randall Waites turned State's evidence and testified. Waites tes-

tified, that he was not present at the robbery and had nothing to do with it. That the matter had been talked over between himself and Teague in the presence of Armstrong, but that he had declined to go into it; and he proved an alibi. The witness Alexander testified, that the robbery was committed by Teague and himself, but that Armstrong knew all about it, and that he rode Armstrong's horse, and that it was Armstrong's Winchester rifle which he carried with him and used at the time of the robbery. He testified, that after they had returned that night from the scene of the robbery to Armstrong's house they went into a cellar and counted the money. That Teague counted the money, and said that there was $2840, of which he gave him (witness) $1440—one-half. That he put this $1440 in his pocket that night. That the next morning after he got up he went into the pasture after his horse, and defendant went with him. That after they started he gave defendant $200 of the money, and told defendant that he thought they had better leave the balance of the money out in the pasture, which they did, and covered it with a chunk. That they did not find his horse, and went on back to the house. That he staid at the house that day, and Teague and defendant went off to town. That that night he found his money had been moved from where he had left it under the chunk. That defendant said that he had moved the money, and that there was not near as much money in the pile as they had said there was. He said there was only $840 in the pile. That they had some words about it, and he said he would go and get the money and count it again; and defendant and Teague went to the house to get the money. That Randall Waites, who was present, told him, after they had gone, not to say anything; that they had all the advantage of us. That when they returned they counted him out $840, which he took. That he turned the money over to Randall Waites to carry for him, and that that night, after they had started towards home, he agreed to give Waites one-half of the money for a half-interest in the horses that they were taking off to trade and sell. That they sewed the money up in the boot-leg of Waites for safe-keeping, and used it as they needed it, until they got back to Mount Vernon, where they turned over the $560 that was left, to Joe Waites, for safe-keeping.

Defendant testified in his own behalf, and denied all the material facts stated by the other witnesses implicating him in the robbery.

Certain portions of the witness Mart· Cook's testimony taken at the examining trial were shown to him, which tended to contradict his testimony, and he admitted that the statements made at the examining trial were "true." The State then proposed to read these statements made on the examining trial, to which defendant objected, because, having offered them for the purpose of impeaching that witness, and he having admitted them to be "true," that was an end of the matter, and such statements could not be read as evidence of defendant's guilt.

This objection was overruled, and defendant excepted and saved his bill of exceptions.

No briefs found with the record.

HURT, PRESIDING JUDGE.—Teague and Alexander are charged as principals, Armstrong as an accomplice to the robbery. The State must establish the guilt of the principal. This can be done by such facts as would be competent evidence against him if he were on trial. This rule settles the question against appellant raised in bills of exceptions numbers 1, 2, and 3. Cook, a witness, testified before the examining court. When on the stand, upon this trial, his attention was called to his written evidence taken on examining trial, whereupon he admitted the correctness of his written evidence, stating that it was "true." Counsel for appellant requested the court to instruct the jury, in substance, that the written evidence could be used only for the purpose of impeaching the witness, and not as testimony of the guilt of the accused. This the court refused to do. In this there was no error, and if the court had so instructed the jury, an error against the State would have been made. Counsel for appellant requested the court to instruct the jury, "that all acts and declarations of Alexander and Teague are in evidence only to show their guilt, and can not be used to show the guilt of the defendant." Conspiracy apart, the instruction contains a sound rule of evidence. But let us suppose that the acts and declarations of Alexander or Teague were admissible against them, but not against appellant. Should the requested charge have been given? This depends upon another fact. If the acts and declarations of the principal, though admissible against him, and not admissible against the accomplice, tend to criminate the accomplice, such instructions should be given. But if they have no such tendency, such a charge is not required. Why? Because the jury could not use them for an improper purpose; they could be utilized only for the purpose of proving the guilt of the principal. Looking carefully through the statement of facts, we find no act or declaration of either of the principals which tends to criminate the defendant.

The statement of facts covers forty pages (printed). We have examined it with great care, and must say that the accomplices, Alexander and Waites, were not very cogently corroborated by evidence from other sources. We are not to be understood as intimating that the corroboration is not sufficient, but that it is not very clear. We allude to this fact for the purpose of accentuating the necessity of instructing the jury in the manner requested by the appellant. Upon the necessity of corroboration the court gave this charge: "A conviction can not be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the

offense committed, and one accomplice can not corroborate another accomplice, and the corroboration is not sufficient if it merely shows the commission of the offense.   An 'accomplice,' as the word is here used, means any one connected with the crime committed, either as principal offender, as an accomplice, as an accessory, or otherwise. It includes all persons who are connected with the crime by unlawful act or omission on their part, transpiring either before or after the commission of the offense, and whether or not he was present and participated in the commission of the crime."   Counsel for appellant requested the following instructions:   "The jury are instructed that an 'accomplice,' as the term is applied to a person charged with the commission of a criminal offense, is one who is not present at the commission of the offense; but who, before the act is done, advises, commands, or encourages another to commit the offense, or agrees with the person or persons committing the offense to aid him or them in committing the same, though in fact he may not have given such aid; or who promises any reward, favor, or other inducements, or threatens any injury, in order to procure the commission of the offense; or who prepares arms or aid of any kind prior to the commission of an offense, for the purpose of assisting the principal offender in the execution of the same.   That term, as applied to witnesses testifying on the trial of a criminal action, has a broader signification, and, in addition to accomplices as the same are above defined, includes all persons principal offenders, or persons engaged in the commission of the offense, and all persons who, knowing that an offense has been committed, conceal the offender, or give him any other aid, in order that he may evade arrest and trial."   "The jury are instructed, that if they believe from the evidence that the witness Minden Alexander, together with Will Teague, or with any other person, robbed the witness J. G. Barry of any sum of money in Coleman County, Texas, on or about the 24th day of May, 1893, and that, after said robbery, said Randall Waites received any portion of said money from the said Minden Alexander, knowing the same to have been fraudulently acquired by the said Alexander in the said robbery, you will find that the said Waites is an accomplice to said robbery, and will have to be corroborated, as any other accomplice, before you can convict the defendant."

The court's definition of an accomplice is correct.  But what information does it furnish the jury?  They may know what is meant by "principal," and they certainly have been informed as to the meaning of the word "accomplice," as distinguished from a "principal offender."   But what instructions have they received as to the meaning of "accessory?"  Nothing whatever.  The jury are told in the last sentence of the charge, that "accomplice" includes all persons who are connected with the crime by unlawful act or omission on their part, transpiring before or after the commission of the crime, though not

present and participating in the crime. Now, what unlawful act is referred to which occurred after the crime? There was no act proven against Waites which occurred before or at the time of the crime. What, therefore, unlawful acts or omissions were referred to? After the crime, what did Waites do? What were the unlawful acts committed by him which connected him with the robbery? Upon these important matters the jury were left completely in the dark, without guide or compass. That Alexander was an accomplice is evident; that Waites was an accomplice in law is beyond any sort of question. This being the case, why should the court submit this issue to the jury? Why not tell the jury that they were accomplices? Why go to the trouble of defining what constitutes an accomplice? If there be an issue raised by the evidence whether a witness be an accomplice or not, in such a case the court should leave the issue to be decided by the jury under proper instructions. What character of instructions? Abstract propositions of law, or definitions? By no means. The instructions upon this issue should be like all others. They should be applied to the facts bearing upon the issue. The jury should be told to find that the witness was an accomplice if he did certain things, or omitted to do certain things, if the things done or omitted in law made him an accomplice. Applying this plain rule to the case in hand, let us first ascertain what Waites did. He knew that the robbery had been committed. The second day after the robbery (Waites having, on the day before, received from Alexander $840, and placed it in his pocketbook, with full knowledge that it was a part of the spoils of the crime), the money was again counted, and the amount found to be $840. Waites swears: "Kid (meaning Alexander) ripped open my boot-leg and we put the money in the boot-leg, sewed the boot-leg up, and we carried the money that way while we were traveling. I wore the boot that had the money in it. We went to Franklin County. I turned the money over to Joe Waites," etc. Upon these and other facts defendant relied to show Waites an accomplice. If this is what Waites did with knowledge of the crime, applying the rule above stated, the court should have instructed the jury, that if they believed these facts (naming them), Waites, in law, would be an accomplice. The requested instructions sought to do this very thing, and though not sufficiently full, served to call the attention of the court to the proper character of instructions which should be given.

Now, we are not to be understood as holding that the judgment will be reversed in all cases in which the court instructs the jury in the manner and form as was done in this case. But when the jury may not understand abstract propositions of law or legal definitions, the necessity of applying the law to the facts bearing upon the issue becomes imperative, and such a charge as that requested by appellant

should be given. The remarks of the district attorney will not likely be repeated on another trial.

The judgment is reversed and cause remanded.

*Reversed and remanded.*

Judges all present and concurring.